Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
March 12, 2018

**2018 CO 16**

**No. 14SC190, Ybanez v. People—Post Conviction Proceedings—Criminal Trials—Sentencing.**

Ybanez petitioned for review of the court of appeals' judgment affirming his conviction of first degree murder and directing that his sentence of life without the possibility of parole be modified only to the extent of permitting the possibility of parole after forty years.  See People v. Ybanez, No. 11CA0434 (Colo. App. Feb. 13, 2014). In an appeal of his conviction and sentence, combined with an appeal of the partial denial of his motion for postconviction relief, the intermediate appellate court rejected Ybanez's assertions that the trial court abused its discretion and violated his constitutional rights by failing to sua sponte appoint a guardian ad litem; that he was denied the effective assistance of counsel both because his counsel's performance was adversely affected by a non-waivable conflict of interest under which that counsel labored and because he was prejudiced by a deficient performance by his counsel; and that he was entitled to an individualized determination regarding the length of his sentence rather than merely the possibility of parole after forty years.

The supreme court affirmed the judgment of the court of appeals and remanded the case with directions to return it to the trial court for resentencing consistent with the

opinion of this court, for the reasons that Ybanez lacked any constitutional right to a guardian ad litem and the trial court did not abuse its discretion in not appointing one as permitted by statute; that Ybanez failed to demonstrate either an adverse effect resulting from an actual conflict of interest, even if his counsel actually labored under a conflict, or that he was prejudiced by his counsel's performance, even if it actually fell below the required standard of competent representation; and that Ybanez is constitutionally and statutorily entitled only to an individualized determination whether life without the possibility of parole or life with the possibility of parole after forty years is the appropriate sentence.

**The Supreme Court of the State of Colorado**

2 East 14th Avenue • Denver, Colorado 80203

**2018 CO 16**

**Supreme Court Case No. 14SC190**
*Certiorari to the Court of Appeals*
Court of Appeals Case No. 11CA434

**Petitioner:**

Nathan Gayle Ybanez,

v.

**Respondent:**

The People of the State of Colorado.

**Judgment Affirmed**
*en banc*
March 12, 2018

**Attorneys for Petitioner:**
Davis Graham & Stubbs LLP
Shannon Wells Stevenson
Emily L. Wasserman
Claire E. Mueller
  *Denver, Colorado*

**Attorneys for Respondent:**
Cynthia H. Coffman, Attorney General
John T. Lee, Assistant Attorney General
  *Denver, Colorado*

**Attorney for Amicus Curiae Colorado Office of the Child's Representative:**
Colorado Office of the Child's Representative
Sheri Danz, Deputy Director
  *Denver, Colorado*

**Attorneys for Amici Curiae Juvenile Law Center, et al.:**
Juvenile Law Center
Marsha Levick
  *Philadelphia, Pennsylvania*

Colorado Juvenile Defender Center
Hannah Seigel Proff
  *Denver, Colorado*

**Attorneys for Amici Curiae Legal Ethics Professors:**
University of Colorado Law School
Melissa Hart
  *Boulder, Colorado*

University of Denver Sturm College of Law
Eli Wald
  *Denver, Colorado*

**Attorney for Amicus Curiae the Twentieth Judicial District, Office of the District Attorney:**
Stanley L. Garnett, District Attorney
  *Boulder, Colorado*

**JUSTICE COATS** delivered the Opinion of the Court.
**JUSTICE HOOD, JUSTICE GABRIEL,** and **JUSTICE HART** do not participate.

¶1 Ybanez petitioned for review of the court of appeals' judgment affirming his conviction of first degree murder and directing that his sentence of life without the possibility of parole be modified only to the extent of permitting the possibility of parole after forty years. See People v. Ybanez, No. 11CA0434 (Colo. App. Feb. 13, 2014). In an appeal of his conviction and sentence, combined with an appeal of the partial denial of his motion for postconviction relief, the intermediate appellate court rejected Ybanez's assertions that the trial court abused its discretion and violated his constitutional rights by failing to sua sponte appoint a guardian ad litem; that he was denied the effective assistance of counsel both because his counsel's performance was adversely affected by a non-waivable conflict of interest under which that counsel labored and because he was prejudiced by a deficient performance by his counsel; and that he was entitled to an individualized determination regarding the length of his sentence rather than merely the possibility of parole after forty years.

¶2 Because Ybanez lacked any constitutional right to a guardian ad litem and the trial court did not abuse its discretion in not appointing one as permitted by statute; because Ybanez failed to demonstrate either an adverse effect resulting from an actual conflict of interest, even if his counsel actually labored under a conflict, or that he was prejudiced by his counsel's performance, even if it actually fell below the required standard of competent representation; and because Ybanez is constitutionally and statutorily entitled only to an individualized determination whether life without the possibility of parole or life with the possibility of parole after forty years is the appropriate sentence, the judgment of the court of appeals is affirmed, and the case is

3

remanded with directions to return it to the trial court for resentencing consistent with the opinion of this court.

# I

¶3     In 1999, a month before his eighteenth birthday, Nathan Gayle Ybanez was convicted as an adult of first degree murder for the 1998 beating and strangulation death of his mother, and he was sentenced to life imprisonment without the possibility of parole.  He did not appeal his conviction or sentence, but in 2007 he filed a motion for postconviction relief pursuant to Crim. P. 35(c), challenging the effectiveness of his counsel's representation and the constitutionality of his sentence.  That motion was heard in 2009 and partially granted in 2011, only to the extent of reinstating his right to appeal.  He then filed an appeal of his conviction and sentence, as well as an appeal of the denial of the remainder of his motion for postconviction relief, which were heard by the court of appeals as a single combined appeal.  The court of appeals affirmed the lower courts, and the defendant petitioned this court for a writ of certiorari.

¶4     At trial, the prosecution's case was presented largely through the testimony of the officers who apprehended the defendant attempting to dispose of his mother's body and who investigated the scenes of both the arrest and the murder; the pathologist who performed the autopsy; and the testimony of one of the three young men who conspired to clean up the scene, dispose of the body, and cover up the murder, but who had subsequently agreed to testify in exchange for not being charged for his participation.  In addition, the prosecution presented the testimony of the defendant's father, who had been with the defendant and his mother earlier in the day of the

4

murder and who had persuaded the mother not to immediately send the defendant to military school; the defendant's girlfriend, whom the defendant called immediately after the murder and who warned the other two conspirators of the police investigation implicating them; and a friend of the victim, who had no first-hand knowledge of the killing. The defendant did not testify on his own behalf or present any witnesses.

¶5 The evidence presented at trial was to the effect that on the evening before her murder, the victim packed her car with things the defendant would need at a military school to which she intended to take him the next day. At her request, the father, who had moved out of the family home over tension concerning how to deal with increasingly problematic behavior of the defendant, came to the apartment the next morning, but rather than helping take the defendant to the military school as intended, managed to persuade the victim to agree to give the defendant another chance to change his behavior. That afternoon the defendant worked his job at Einstein's Bagel's, where he told his friend and fellow punk-band member Bret Baker, and had already told their mutual friend and bandleader Eric Jensen, that he was going to kill his mother that night. Baker testified that the defendant had made similar statements before and that he did not take the threat seriously.

¶6 Baker recounted that sometime after 9 p.m. he got a page from the defendant and upon calling back, both the defendant and Jensen told him to hurry over to the defendant's apartment. On arrival he was met at the door by Jensen, who appeared scared and had blood on his face, and he saw the defendant, who was blood-soaked and cleaning blood from the carpet. Baker testified that despite his initial resistance, at

Jensen's order he helped clean and dispose of bloody items, and he described how the defendant and Jensen took showers and how all three filled eight to twelve trash bags with the bloody items and the victim's clothes, to be disposed of, in hopes of making it appear that she had simply left with the defendant.

¶7 Baker and Jensen then left to dispose of the bags in trash dumpsters and returned with a can of gas and shovel to implement Jensen's plan to burn and bury the body. They then helped the defendant bring his mother's body—which was inside a sleeping bag—from the deck where it had been kept during the cleanup, wrap it in a rug, tie it with a cord from a guitar amplifier, and carry it to the trunk of the victim's Lexus. Baker testified that when questioned the defendant indicated to him that he killed his mother to prevent her from hurting him, and after being dissuaded from remaining in Denver with friends, as he had planned, the defendant agreed to leave for Mexico after disposing of the body.

¶8 Baker and Jensen then left in Jensen's car, disposed of the remainder of the bloody evidence, and returned to Jensen's house. Baker testified that during that time Jensen told him that he had hit the victim in the head with fireplace tongs three times, specifying that at one point the tongs became stuck, forcing him to pull them out, streaking the ceiling with blood. The two concocted a story to tell the police to the effect that they had come over to the defendant's house earlier in the evening but had left when his mother sent them away, and that they then drove around looking for a party, but failing to find one, went for coffee.

¶9 Later that night, the defendant called his girlfriend and asked her to wait-up late and let him into her basement when he showed up. About 4 a.m., he was apprehended by a Douglas County Deputy Sheriff while attempting to dispose of the victim's body at a nearby park. In addition to the victim's body, which was stuffed inside the sleeping bag and wrapped in the rug, with the head covered by a trash bag, a number of other incriminating items were also found inside the mother's Lexus, including the fireplace tongs with her blood on them and the gas can, later identified by surveillance footage as having been purchased by Jensen at a nearby gas station. An autopsy would reveal that the victim had been severely beaten about the head with an object that could have been the fireplace tongs and that although those wounds may have proved fatal if left untreated, within a reasonable degree of medical certainty she had been killed by asphyxiation, as the result of manual strangulation, which could also have been caused by the fireplace tongs.

¶10 The defendant was arrested and taken to jail. Although the jury was not told of it because the defendant's father refused to sign a waiver, the defendant was interrogated that night and confessed to the killing by himself, without implicating Jensen or Baker. The defendant's subsequent motion to have his statement declared involuntary, and therefore barred from use even to impeach him if he testified, was denied. The next evening the defendant called his girlfriend from jail and also told her that he had killed his mother and had planned to go to Mexico. While he did not share any details with her, he did tell her that Jensen was there for the murder and that Baker had come over after and helped clean the scene.

¶11     The girlfriend testified that she did not believe the defendant at first, that he had made similar threats before, and that she considered him incapable of killing his mother, but she nevertheless told the investigators what he said to her. After identifying Jensen in the gas station photo, however, the girlfriend also notified Jensen and Baker, who hurriedly fled to Mexico. After only one day, the two called their fathers, who met them in Texas and returned them to Colorado. Baker subsequently entered into a plea arrangement with the government and testified against both Jensen and the defendant, who were convicted in separate trials and sentenced to life in prison.

¶12     Although the defendant did not testify or present any defense witnesses, defense counsel was able to present a picture of the defendant, through the testimony of his father, who had initially been called by the prosecution, as a good kid who fell under the influence of Jensen and Baker after leaving private for public school and joining their punk rock band. The father was questioned and testified about his attempts to discipline the defendant, including one episode in which he trashed the defendant's room and threw him up against a wall, and about the defendant's attempts to run away to his friends' houses and their attempts to convince him that he was being abused by his parents. Through his opening and closing arguments, and his cross-examination of Baker and the girlfriend, defense counsel conceded the defendant's guilt of second degree murder but argued that he did not and could not act after deliberation, a requirement for first degree murder. He attempted to convince the jury of this by minimizing the defendant's participation in the killing and demonstrating that he would not have gone forward with the plan at all but for the presence and urging of

Jensen, and after initially striking his mother, he could not finish the job, which was only accomplished by Jensen.

¶13 Seven years later, the defendant filed a motion for postconviction relief alleging that his trial counsel had been ineffective at trial by failing to present what he asserted was an objectively reasonable defense to deliberation murder—that as the result of past abuse by his father, instigated by his mother, he snapped on the night in question and killed his mother—and that counsel failed to investigate and present such a defense because producing evidence of child abuse would have been embarrassing to the father, by whom defense counsel had been engaged to represent the defendant. Among others, the defendant presented expert testimony from an attorney experienced with the Colorado Rules of Professional Conduct, who testified that the representation involved a non-waivable conflict and violated C.R.P.C. 1.7 and 1.8; expert testimony from an experienced defense attorney, who opined that the performance of counsel in this case fell below accepted professional standards as the result of his failure to adequately investigate and produce evidence of child abuse by the father; and expert testimony from a forensic and clinical psychologist, engaged by a non-profit organization founded by the parents of Eric Jensen to help provide legal assistance to juveniles sentenced to life without the possibility of parole, who opined that the defendant did not have the ability to make a plan to kill his mother because he was undergoing a "catathymic crisis" and killed her "in a reflexive action as an outpouring of uncontrolled, disinhibited rage" caused by the abuse he had experienced.

¶14    Trial counsel also testified at length, explaining his choices and defense strategy. With regard to the representation itself, he testified that he advised both father and son that he would represent only the son and that he obtained the son's consent to the representation, under these circumstances. Although the engagement was arranged through the father, counsel testified that the first installment payment to cover his representation through the preliminary hearing actually came from the victim's mother, who the father explained would not make any further payments. The father further explained that he would be unable to do so himself. Although counsel discussed withdrawing from representation at that point and having the defendant seek representation from the public defender, he testified that he remained on the case without any expectation of payment at the pleading of the defendant and that he worked with the defendant to fashion an acceptable defense.

¶15    With regard to his choice of defense, counsel testified that he suspected abuse by the father but rejected a defense to "deliberation" murder based on such abuse, even if it had occurred, for a host of reasons unrelated to any conflict of loyalties, which he unequivocally disputed. In light of the defendant's insistence that he had not been abused by his father, counsel was advised by a mental health professional whom he consulted that it would not be wise from a defense perspective to pursue the matter with the defendant. Similarly, counsel testified that he considered it too risky to rely on a mental health defense at trial, in part because the diagnosis of his own experts indicated that although a defense of insanity or impaired mental condition was not viable, nevertheless the defendant had psychopathic tendencies, lacked conscience or

empathy, and was willing to do anything to get his present needs met. In counsel's judgment, a mental health defense under these circumstances, might influence a jury to believe the defendant was dangerous and untreatable and therefore cause them to be unsympathetic to a lesser charge. Counsel also noted that his trial strategy to reject psychological evidence was influenced by the recent Columbine killings, which would be fresh in the juror's minds, and by a book that was current at the time, called "The Abuse Excuse," which made the case that juries would not be accepting of those kinds of psychological defenses. Finally, in light of the lack of first-hand knowledge of abuse by any of the other potential witnesses, counsel feared that a defense premised upon prior abuse would require the defendant to testify himself, with all the implications for his un-Mirandized but voluntary confession that would entail.

¶16    With regard to the particular evidence in this case, trial counsel explained his reasoning in choosing to defend on the basis that the defendant initially struck his mother only under Jensen's influence but was unable to follow through and kill her. He noted that the defendant's prior statements about planning to kill his mother to several people would make it difficult to argue for a psychological break at the moment of the attack, and that his confession to the police, in which he took all the blame upon himself, would be admissible as impeachment evidence if he testified to acting out of rage himself. Similarly, he had been caught disposing of the body in a deliberate and unemotional manner shortly after the killing and had emotionlessly confessed to his girlfriend about the killing after his arrest.

11

¶17     By contrast, and supporting his choice of defense, counsel pointed to the fact that the forensic evidence did not indicate who had actually caused the victim's death, and that the only admissions concerning the killing acts themselves were those of Jensen, to the effect that he had struck the victim with the fireplace tongs so hard they became embedded, requiring such an effort to pull them out that it caused blood to be streaked on the ceiling.  Counsel testified that the defendant told him the plan was for him to knock his mother out and when Jensen arrived they would strangle her.  The defendant indicated to his counsel that he had, however, retreated to his room until Jensen came to the door, and that it was Jensen who provided the metal bar, helped with the killing, provided the gas to burn the body, directed Baker and the defendant in the cleanup and disposal of the body, and told the defendant to flee to Mexico.

¶18     Following four days of testimony and review of not only that testimony but also the transcript of the trial and several thousand pages of discovery received and reviewed by trial counsel, the arguments and briefing of counsel, and multiple exhibits, the postconviction court issued an eighteen-page, single-spaced order of its findings and conclusions.  The court parsed the evidence presented at the postconviction hearing in detail, explaining why it found much of the defendant's evidence unconvincing; why it found that defense counsel had a cohesive theory at trial, which he presented in voir dire, opening statement, and closing argument; and why it could not find that the conduct of the trial demonstrated a conflict of interest or that counsel's representation fell below an objective standard of reasonableness undermining reliance on the outcome of the trial.

¶19　Initially, the court found that defense counsel was highly experienced in the conduct of serious criminal cases, with over thirty years of practice. He specifically noted that counsel had been a juvenile probation officer, headed the Arapahoe Public Defender's Office, was Chief Public Defender handling homicides, and was currently in private practice.

¶20　With regard to the defendant's psychological expert, upon whose testimony rested the proposed alternate defense theory of reflexive action and uncontrollable rage induced by prior abuse, the court found that the psychiatric expert presented by the prosecution raised persuasive and credible concerns about the reliability of his conclusions. The court noted in particular that the evidence of numerous prior rages and beatings by the parents was unsubstantiated; that there was inadequate critical analysis or independent corroboration of the information supplied solely by the defendant; and that no consideration had been given to malingering or secondary gain on the defendant's part, despite a clear motive to have his conviction set aside. Perhaps most importantly, however, the court found that the prosecution's psychiatric expert testified credibly that even the concept of "catathymic crisis" was not well accepted in the field.

¶21　With regard to the defendant's ethical expert, the court found that although she was knowledgeable in the rules of ethics, in light of her lack of experience in the criminal law, it could not rely on her opinion concerning how a conflict-free attorney would have proceeded in his representation of this case. With regard to the defendant's criminal defense expert, the court ultimately found that despite his criticisms of counsel

13

for not more strenuously cross-examining regarding abuse, doing so could have cut both ways. Developing a case for prior abuse would have been at cross-purposes with counsel's chosen defense.

¶22 With regard to the defendant's assertion that counsel had been ineffective in reserving his right to appeal, however, the postconviction court agreed, finding that defense counsel's admittedly tactical choice not to advise the defendant of his right to appeal or respond to his subsequent letter requesting that counsel file an appeal amounted to inadequate representation which, in combination with the trial court's failure to advise him, as required by Crim. P. 32, entitled him to file an appeal. Pre-dating as it did the United States Supreme Court's decision in Miller v. Alabama, 567 U.S. 460 (2012), the defendant's challenge to the constitutionality of his sentence to life imprisonment without the possibility of parole was also rejected.

¶23 On appeal, the court of appeals affirmed the denial of the defendant's motion for postconviction relief for ineffective assistance of counsel but, in light of Miller and our holding in People v. Tate, 2015 CO 42, 352 P.3d 959, remanded to the trial court for resentencing to life with the possibility of parole after forty years. In addition, the court of appeals addressed on a plain error standard the question whether the trial court erred in not sua sponte appointing a guardian ad litem to protect the defendant's interests, but it found no plain error.

¶24 We granted the defendant's petition for a writ of certiorari.

## II.

¶25 In 1984, the Supreme Court articulated for the first time a comprehensive understanding of ineffective assistance, making clear that this aspect of the Sixth Amendment right to counsel merely protects a criminal defendant from being prejudiced by a deficient performance from his counsel. United States v. Cronic, 466 U.S. 648, 654–55 (1984); Strickland v. Washington, 466 U.S. 668, 692 (1984). Excepting only a few narrow circumstances in which the Court had previously presumed prejudice—notably where counsel was not made available, was prohibited by the trial court from participating in a critical aspect of the proceeding, or acted under a conflict of interest—this constitutional right is now held to be violated only upon a demonstration of likely prejudicial impact on the outcome of a particular adjudication. See Mickens v. Taylor, 535 U.S. 162, 171 (2002); Strickland, 466 U.S. at 687; Cronic, 466 U.S. at 665; see generally 3 Wayne R. LaFave et al., Criminal Procedure, § 11.7(d) (3d ed. 2013). With regard to the exception for conflicts of interest, several years prior to finally arriving at its comprehensive standard in Strickland, the Court found it appropriate to presume prejudice where a trial court declines to inquire further into defense counsel's assertion that he will be unable to adequately represent the interests of multiple codefendants at the same trial. Holloway v. Arkansas, 435 U.S. 475, 485 (1978). Shortly thereafter, it extended that proposition to hold that relief from an alleged conflict arising from such joint representation, which is raised initially only after conviction in a case in which the trial court neither knew nor had reason to know of any particular conflict requiring further inquiry, would be contingent upon a demonstration that the

15

conflict actually affected the adequacy of counsel's representation. <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 349–50 (1980).

¶26 Although it has continued to recognize this standard for assessing the impact of "actual conflicts" to be an exception to the <u>Strickland</u> standard, in <u>Mickens</u> the Court clarified the scope of the exception to some degree by emphasizing that "the <u>Sullivan</u> standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect." <u>Mickens</u>, 535 U.S. at 172 n.5. Rather, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." <u>Id.</u> Acknowledging in <u>West</u> this unambiguous proposition from <u>Mickens</u>, we expressly overruled our prior holding to the contrary in <u>People v. Castro</u>, 657 P.2d 932, 945 (Colo. 1983), which had effectively eliminated the need for defendants to demonstrate an adverse effect in order to establish an actual conflict. <u>See</u> <u>West v. People</u>, 2015 CO 5, ¶¶ 26–29, 341 P.3d 520, 528.

¶27 In <u>West</u>, we therefore held that in order for a defendant to demonstrate that he was deprived of the effective assistance of counsel as the result of an actual conflict of interest, he must show not only that his counsel labored under a conflict of a kind to which the <u>Sullivan</u> prophylaxis applies but also that counsel's representation was adversely affected by that conflict. <u>Id.</u> at ¶ 36, 341 P.3d at 530. Following a detailed evaluation of the treatment of this "adverse effect" requirement by the various federal circuits having considered it, we articulated a three-part standard for this jurisdiction, largely adopted from the Fourth Circuit. <u>Id.</u> at ¶ 54, 341 P.3d at 533. Accordingly, we held that to prove an adverse effect, a defendant must (1) identify a plausible alternative

16

defense strategy or tactic that counsel could have pursued, (2) show that the alternative strategy or tactic was objectively reasonable under the facts known to counsel at the time of the strategic decision, and (3) establish that counsel's failure to pursue that strategy or tactic was linked to the conflict. Id. at ¶ 57, 341 P.3d at 533.

¶28    With regard to the existence of a plausible alternative defense strategy, we noted, among other things, that ultimately the inquiry requires the defendant to identify an unpursued strategy that was "obviously in the defendant's interest under the circumstances." Id. at ¶ 58, 341 P.3d at 533. In addition to the existence of such a plausible alternative defense strategy, however, we made clear that the inquiry into objective reasonableness must include consideration of a host of factors that will necessarily vary from case to case, including for example such things as the information that the defendant communicated to the attorney upon which the attorney based his decisions concerning how to proceed, and the viability of the alternative strategy in light of all those factors. Id. at ¶ 60, 341 P.3d at 533. Finally, even if the defendant demonstrates the existence of such a plausible alternate defense strategy and that it would have been objectively reasonable to pursue that strategy in light of all the attendant circumstances known to counsel, the defendant must also demonstrate that the alternative strategy in question was not pursued due to the attorney's competing loyalties or interests. Id. at ¶ 61, 341 P.3d at 534.

¶29    With regard to the kinds of conflicting loyalties or interests to which the so-called Sullivan prophylaxis, rather than the Strickland standard, is at least potentially applicable, in West we acknowledged remaining uncertainty and expressly limited our

17

holding in that case to the conflicts arising from multiple representation implicated there.  Id. at ¶ 36 n.8, 341 P.3d at 530.  Again today, although for very different reasons, we find it unnecessary to decide the extent to which the separate standard for actual conflicts of interest applies to conflicting loyalties or interests apart from those implicated by multiple representations.

## III.

¶30  The defendant asserts that he was deprived of the effective assistance of counsel both because his counsel failed, as the result of a conflict of interest, to pursue a plausible defense, capable of mitigating first to second degree murder, that it would have been objectively reasonable for him to pursue and, alternatively, because the failure of his counsel to pursue that defense resulted in a constitutionally deficient performance, but for which there would have been a reasonable likelihood that the defendant would have been convicted of no more than second degree murder.  With regard to the former contention, the postconviction court made a number of findings, both factual and legal, leading it to conclude that defense counsel did not labor under an actual conflict of interest.  It is, however, unnecessary for us to resolve whether the father's engagement contract with the defendant's counsel to defend his son created a non-waivable or non-consentable conflict of interest, as the defense expert testified, much less a conflict of a kind to which the Sullivan prophylaxis rather than the Strickland standard would control, for the reason that the defendant failed to demonstrate in his postconviction proceedings that any such conflict, even if one existed, had an adverse effect on counsel's performance.

¶31 While the defense presented additional circumstantial and second-hand evidence that the defendant had been abused, the relevance of that evidence, even if it were to be credited, rested entirely on the opinion of the defense-expert clinical psychologist that the defendant was undergoing a "catathymic crisis" and killed his mother in a reflexive action of uncontrollable rage caused by that abuse. As a factual matter, the postconviction court was persuaded instead by the testimony of the People's psychiatric expert not only that the defense expert's methodology was flawed, in part because it relied too heavily on unsubstantiated evidence of abuse and failed to consider malingering and secondary gain on the defendant's part, but also because his theory of "catathymic crisis" was not even well-accepted in the field. While the postconviction court did not have the benefit of our later opinion in West, and therefore could not know to express its findings in the precise terms of the standard we adopted there, it effectively found that the defense failed even to identify a plausible alternative defense that counsel could have pursued.

¶32 Whether the alternate defense postulated by the defendant might have been considered plausible or not, however, the postconviction court credited defense counsel's testimony concerning the circumstances and information to which he was privy, as well as the alternative options available to, and considered by, him, leading to a conclusion that it would not have been objectively reasonable in any event for him to pursue the alternate theory now advanced by the defendant. Among the other findings expressly relied on by the postconviction court in this regard, it noted the absence of first-hand perceptions of abuse without the testimony of the defendant himself, which

19

would have required the recantation of his consistent denials of abuse as well as subjecting him to impeachment with his otherwise inadmissible confession to the police. The court also noted defense counsel's wariness of attempting any psychological defense in light of the diagnosis of his own experts suggesting psychopathic tendencies of his client that might well cause a jury to fear his future dangerousness and be unsympathetic to a lesser sentence, as well as external contemporaneous events suggesting that juries might be particularly unaccepting of such a psychological defense at that point in time.

¶33 Because the two theories of mitigation were contradictory of each other, the reasonableness of pursuing a defense of spontaneous rage at the mother caused by distant abuse by the father could be assessable only in comparison with the reasonableness of the dominant companion theory actually pursued. By contrast with the former, a theory premised on the defendant's having fallen under the influence of an older, dominant companion, without whose direction the defendant would not have acted at all and who the evidence suggested actually brutalized the victim and consummated the killing himself, found support in the evidence without the corresponding risks associated with the psychological defense. While the postconviction court clearly discredited any suggestion that defense counsel failed to pursue a defense of spontaneous rage caused by prior abuse as the result of any competing loyalty to the defendant's father, it is enough that substituting such a defense for the defense theory actually presented would not have been objectively reasonable.

¶34    Because the defendant failed to prove the requirements for establishing an adverse effect, he failed to prove that his counsel was ineffective as the result of an actual conflict of interest, regardless of the merits of his contention that counsel labored under an ethical conflict as to which he argues the <u>Sullivan</u> prophylaxis would apply. With regard to the defendant's alternate argument, for many of the same reasons causing the postconviction court to conclude that defense counsel did not labor under an actual conflict of interest, it similarly concluded that his performance did not fall below the standard of reasonable competence required by the two-pronged <u>Strickland</u> test, much less that but for deficiencies in his performance, there would have been a reasonable probability the defendant would have been convicted only of second degree murder.

¶35    The defendant attempted to demonstrate that defense counsel's performance fell below that of reasonable competence in part because of his failure to investigate more fully whether the defendant had been abused by his father. The defendant himself, however, consistently denied any such abuse, which denials, as the Supreme Court has previously held, were entitled to reliance by counsel without further investigation. <u>Strickland</u>, 466 U.S. at 691. More importantly, however, the postconviction court credited counsel's reasons for making the strategic choice not to pursue the matter, regardless of anything further investigation into past abuse might have revealed. In light of the court's findings regarding the implausibility of the alternate theory of mitigation now advanced by the defendant, the credibility of defense counsel's explanation about his own reasoning, and especially the deference to which such

21

strategic choices by defense counsel are entitled, id. at 681, it can hardly be said that counsel's choice of defense fell below the level of reasonable competence.

¶36     With regard to the second, or prejudice, prong of the Strickland standard, even if the postconviction court had not been dissuaded from crediting the defense expert's opinion or the reliability of his psychological theory, and even if it had not credited the testimony of trial counsel concerning the reasons for his choice of defense, the overwhelming evidence of the defendant's planning, participation in, and attempt to cover-up his mother's murder make it impossible to find a reasonable probability that the jury would not have found the defendant guilty of first degree, deliberation murder, regardless of the choice of defense.

## IV.

¶37     The defendant additionally asserts that he was both constitutionally and statutorily entitled to the appointment of a guardian ad litem, despite one not having been requested, and that the failure to appoint one was structural error. With regard to any constitutional entitlement, while he clearly had a due process right not to be subjected to a prosecution at which he lacked the capacity to appreciate the nature of the proceedings and assist his counsel in his defense, Dusky v. United States, 362 U.S. 402, 402 (1960), a Sixth Amendment right to the effective assistance of counsel, McMann v. Richardson, 397 U.S. 759, 771 (1970), and an Eighth Amendment right not to be subjected to cruel and unusual punishment, Miller, 567 U.S. at 469–70, the defendant had no separate and broader due process right to the appointment of a guardian ad litem. Neither the Supreme Court nor this court has ever suggested such a due process

22

requirement, over and above these more specifically enumerated rights, constitutionally guaranteeing criminal defendants due process. In this case, the defendant does not allege that he was incompetent to proceed at trial; we have found that he was not deprived of the effective assistance of counsel; and the People do not dispute that he is entitled to resentencing in accord with the Eighth Amendment.

¶38 With regard to a statutory entitlement, section 19-2-517 of the revised statutes provides that it remains within the discretion of the court to appoint a guardian ad litem for a juvenile charged as an adult by direct filing in the district court, as would be the case if he were tried for the same conduct as a juvenile, in a delinquency proceeding. § 19-2-517(8), C.R.S. (2017). While that provision does not embellish on the exercise of the court's discretion in this regard, sections 517 and 518 enumerate the circumstances under which a juvenile may be tried as an adult for criminal conduct, with the former specifying when a juvenile may be charged by direct filing of an information in the district court or by indictment and the latter specifying when a petition in delinquency may be transferred from the juvenile court, for criminal proceedings in the district court. § 19-2-517 to -518. Unlike section 517, section 518 does not, and need not, specifically reserve the court's discretion to appoint a guardian ad litem because, unlike direct file cases, cases subject to transfer must have been initiated as delinquency proceedings, with regard to which the circumstances under which the juvenile court may exercise discretion to appoint a guardian ad litem are spelled out in detail. See § 19-1-511(2)(a).

¶39 The juvenile court is statutorily permitted to appoint a guardian ad litem in delinquency proceedings, and therefore in adult criminal proceedings in the district court initiated by transfer, only upon the occurrence of one of three triggering events. The juvenile court may appoint a guardian ad litem for the juvenile in delinquency proceedings where no parent or enumerated person functioning in the role of parent appears in the case; where the court finds a conflict of interest between the child and parent or person functioning as a parent; or where the "court makes specific findings that the appointment of a guardian ad litem is necessary to serve the best interest of the child and such specific findings are included in the court's order of appointment." § 19-1-111(2)(a)(I)–(III). Unless the legislature intended the court's discretion in direct file felony cases to be different in scope and purpose from its discretion in felony cases transferred from delinquency proceedings, the spare provision for guardians ad litem in section 517 must be similarly limited, according to the more specific provisions of section 19-1-111. In light of the placement, structure, and subject matter of the statutes and the absence of any apparent reason for the disparate treatment of juveniles tried as adults by direct filing and those tried as adults by transfer, we find this to be the case.

¶40 Relying on case law in other contexts in which we have held that the failure to exercise discretion can, in itself, amount to an abuse of discretion, the defendant asserts that by failing to act, sua sponte, to appoint a guardian ad litem for him, the court erred and that error amounted to plain, if not structural, error. However, we have clearly never held, and it is clearly not the case, that a court abuses its discretion by not considering and making a record of its considerations with regard to every action it is

24

within the court's discretion to take. Unlike those situations in which a court is statutorily directed to make an independent judgment and fails to make a record of its considerations, see, e.g., People v. Darlington, 105 P.3d 230 (Colo. 2005) (finding failure to make independent judgment whether to grant plea concessions), the district court in criminal trials of juveniles as adults is not only not directed to exercise independent judgment whether to appoint a guardian ad litem but is in fact permitted to do so only under specified circumstances.

¶41 None of the three possible triggering events prompted, or even permitted, the court to exercise its discretion in this case. The defendant's father was clearly present and actively supporting the defendant throughout, and neither the defendant nor anyone else made the court aware of a conflict of interest between them, even if one had existed. Nor was there any motion or other occurrence prompting the court to make "specific findings that the appointment of a guardian ad litem [would be] necessary to serve the bests interests of the child," the final prerequisite for exercising of its discretion to do so, or any indication in the record that it would have been an abuse of discretion to have found otherwise. Not only was the defendant one month away from turning eighteen, the age at which the appointment of a guardian ad litem would statutorily terminate even had it been made, but the court was also aware of the father's actions to protect his son during the police investigation, his efforts to engage an experienced defense counsel to act on his son's behalf, and his presence and support during proceedings at the request of his son.

## V.

¶42 Finally, the defendant asserts that he is entitled to an individualized determination concerning the length of his sentence rather than being subjected to a sentence of life with possibility of parole after forty years. We have considered the arguments of the defendant in People v. Tate, 2015 CO 42, 352 P.3d 959, and found them to be without merit, and the legislature has subsequently enacted legislation mandating a sentence for juveniles tried as adults and convicted of class one felonies of life with the possibility of parole only after serving forty years, see § 18-1.3-401(4)(c)(I)(B).

## VI.

¶43 Because Ybanez lacked any constitutional right to a guardian ad litem and the trial court did not abuse its discretion in not appointing one as permitted by statute; because Ybanez failed to demonstrate either an adverse effect resulting from an actual conflict of interest, even if his counsel actually labored under one, or that he was prejudiced by his counsel's performance, even if it actually fell below the required standard of competent representation; and because Ybanez is constitutionally and statutorily entitled only to an individualized determination whether life without the possibility of parole or life with the possibility of parole after forty years is the appropriate sentence, the judgment of the court of appeals is affirmed, and the case is remanded with directions to return it to the trial court for resentencing consistent with the opinion of this court.

**JUSTICE COATS** delivered the Opinion of the Court.
**JUSTICE HOOD**, **JUSTICE GABRIEL**, and **JUSTICE HART** do not participate.