25CA0555 Peo in Interest of TD-JG-R 10-09-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0555
City and County of Denver Juvenile Court No. 23JV30171
Honorable Elizabeth McCarthy, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of T.D-J.G-R. and A.L-L.G-R., Children,

and Concerning A.R.R. and T.J.G.,

Appellants.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 9, 2025

---

Michiko Ando Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant A.R.R.

Gregory Lansky, Office of Respondent Parents' Counsel, Aurora, Colorado, for Appellant T.J.G.

¶ 1 In this dependency or neglect proceeding, T.J.G. (father) and A.R.R. (mother) appeal the judgment terminating their parent-child legal relationships with T.D-J.G-R. and A.L-L.G-R. (the children). We affirm.

## I. Background

¶ 2 The Denver Department of Human Services (the Department) filed a petition in dependency or neglect based on concerns regarding the parents' substance abuse. The Department did not initially seek custody, requesting only supervision and support for the family. However, when the parents failed to communicate with the Department and to cooperate with drug testing, the juvenile court granted temporary custody to the Department. The children were placed with paternal grandmother where they remained throughout the case.

¶ 3 Following a lack of participation from mother and father, the juvenile court adjudicated the children dependent or neglected by default and adopted treatment plans requiring both parents to maintain consistent contact with the children and to immediately contact the Department to devise a detailed treatment plan. Eight months later, father began participating, and the juvenile court

adopted a revised treatment plan requiring him to, among other things, (1) cooperate with the Department; (2) obtain stable housing and income; (3) attend mental health treatment and follow all treatment recommendations; (4) complete a substance abuse evaluation and follow all recommendations; (5) attend all scheduled family time; and (6) comply with probation and parole requirements.

¶ 4 Twenty months after the case began, the Department moved to terminate mother's and father's parental rights. Three days later, mother appeared for the first time, and the juvenile court adopted a revised treatment plan requiring her to, among other things, (1) follow all recommendations from her substance abuse evaluation, attend treatment, and complete drug testing; (2) obtain and maintain stable housing and income; (3) participate in mental health treatment and follow all treatment recommendations; (4) participate in scheduled family time; and (5) cooperate with the Department.

¶ 5 Nearly two years after the case opened and following two continuances, the juvenile court held a termination hearing. In the end, the court terminated mother's and father's legal relationships with the children.

## II.    Indian Child Welfare Act

¶ 6    Father contends that the juvenile court did not comply with the provisions of the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963, and Colorado's ICWA statute, § 19-1-126, C.R.S. 2024, *repealed by*, Ch. 338, sec. 1, § 19-1-126, 2025 Colo. Sess. Laws 1779.[1]  Specifically, he contends that the court had "reason to know" that the children were Indian children, such that the Department should have provided formal notice to the identified tribes.  Alternatively, father argues that the court erred by concluding that the Department properly exercised due diligence under section 19-1-126.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 7    For ICWA to apply in a dependency or neglect proceeding, the case must involve an Indian child.  *People in Interest of A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995).  "Indian child" is defined as an unmarried person under the age of eighteen who is either (1) a member of an Indian tribe or (2) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe.

---

[1] Throughout this opinion, we cite the 2024 version of the statute, as that was the version in effect at all relevant times.

3

25 U.S.C. § 1903(4); § 19-1-103(83), C.R.S. 2024.[2] "Until the party asserting the applicability of . . . ICWA establishes, on the record, that the child meets one or both of these criteria, . . . ICWA is not applicable." *A.G.-G.*, 899 P.2d at 321.

¶ 8     In a dependency or neglect proceeding in Colorado, a juvenile court must inquire of the parties whether they know or have reason to know that a child is an Indian child. § 19-1-126(1)(a)(I)(A). If the court knows or has reason to know that a child is an Indian child, ICWA's notice provisions apply. § 19-1-126(1)(b).

¶ 9     A court has reason to know that the child is an Indian child if one of several circumstances exist. *See* § 19-1-126(1)(a)(II). As relevant here, a court has reason to know that a child is an Indian child if any participant in the proceeding, officer of the court involved in the proceeding, Indian tribe or organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. § 19-1-126(1)(a)(II)(B).[3]

---

[2] We also cite the 2024 version of this statute throughout.
[3] Father does not assert the existence of any other circumstance under section 19-1-126(1)(a)(II), C.R.S. 2024, that would have given the juvenile court reason to know that either of the children is an Indian child.

4

¶ 10 "[M]ere assertions of a child's Indian heritage (including those that specify a tribe or multiple tribes by name), without more, are not enough to give a juvenile court reason to know that the child is an Indian child." *People In Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56. As a result, "these types of more generalized assertions of Indian heritage" do not trigger ICWA's notice requirements; rather, they "trigger the due diligence requirement" in section 19-1-126(3). *H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5.

¶ 11 Due diligence requires a department to "earnestly endeavor to investigate the basis" for an assertion that the child may be an Indian child, contact any family members or others specifically identified by a parent as having knowledge of Indian heritage, and learn if there is further information that would help the court in determining if there is a reason to know that the child is an Indian child. *Id.* at ¶ 57. Due diligence does not require a department "to succeed in its efforts or exhaust every possible option in attempting to do so." *Id.* at ¶ 58.

¶ 12 Whether the juvenile court and the Department complied with ICWA is a question of law that we review de novo. *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App. 2009). But whether the

Department satisfied its due diligence obligation is a decision within the juvenile court's sound discretion, *H.J.B.*, ¶ 58, and we will not disturb that decision absent and abuse of discretion.

## B. Additional Background

¶ 13    The petition indicated that mother claimed Lakota Sioux heritage on her maternal side and that father claimed some Indian heritage, but the tribe and affiliation were unknown.

¶ 14    While father did not attend a court appearance for the first eleven months of the case, his mother (paternal grandmother) frequently appeared. She initially reported that her mother (paternal great-grandmother) was "a fourth Potawatomi Indian." After the Department later informed the court that paternal great-grandmother was reportedly enrolled in a Lakota Sioux tribe,[4] but that mother and the children were not enrolled or eligible to be enrolled in a tribe, the juvenile court ordered the Department to investigate further.

---

[4] It is possible this report was a mistake as the record otherwise indicates possible Lakota Sioux heritage on mother's side and possible Potawatomi heritage on father's side.

¶ 15    Four months later, the Department filed a declaration detailing its efforts to determine if there was a reason to know the children were Indian children.  The efforts included:

- Five discussions with paternal grandmother who indicated that paternal great-grandmother may have been enrolled in the Potawatomi tribe but was deceased, there were no other family members besides father who would have additional information, no one in her family lived on a reservation, and she doubted anyone was ever enrolled in a tribe.

- Four discussions with mother's sister (maternal aunt) who reported that maternal great-grandmother, some of her children, and some of her cousins were enrolled in the Lakota Sioux tribe.  But maternal aunt did not have any enrollment numbers or contact information for any other family members, and maternal great-grandmother was deceased.  Maternal aunt also confirmed that mother and the children were not enrolled in a tribe and no one in the family lived on a reservation.

¶ 16     At the next court proceeding, paternal grandmother again disclosed that paternal great-grandmother had "a little bit" of Potawatomi heritage.  The juvenile court ordered the Department to continue exercising due diligence.  Three months later, during father's first court appearance, he stated on the record that he was not a member of any tribe.  A few months later, the Department reported that mother had Lakota Sioux heritage on her mother's side but that she was not registered with the tribe.

¶ 17     Shortly before the termination hearing, the Department filed another declaration of its efforts to determine if there was reason to know the children were Indian children.  In this declaration, the Department explained that it sent (1) informal inquiries, including an ancestry chart of mother's family, by email or fax to the Blackfeet Tribe, Lower Brule Sioux Tribe, Oglala Sioux Tribe, Rosebud Sioux Tribe, and Rocky Mountain Regional Director; (2) informal inquiries, including an ancestry chart of father's family, by email or fax to Citizen Potawatomi Nation, Forest County Potawatomi Nation, Match-E-Be-Nash-She-Wish Band of Potawatomi Indian Gun Lake Tribe, Nottawaseppi Huron Band of Potawatomi Indians, Pokagon Band of Potawatomi Indians, the

Midwest Regional Office, and the Southern Plains Regional Office; and (3) informal inquiries, including father's ancestry chart, by certified mail to the Hannahville Indian Community and the Prairie Band of Potawatomi Nation. At the time of the termination hearing, only the Oglala Sioux Tribe and the Citizen Potawatomi Nation had responded, stating that neither the children nor the parents were members or eligible to be enrolled as members. In its response, the Citizen Potawatomi Nation enclosed a list of eight other Potawatomi Band tribes for reference.

¶ 18 At the termination hearing, the caseworker testified that, based on the Department's efforts, she had no reason to believe the children were Indian children or that mother and father were eligible to enroll as members of a tribe. Mother's and father's attorneys also confirmed they had no new information related to ICWA. The juvenile court concluded that the children were not Indian children, there was no reason to know that the children were Indian children, and the Department had exercised due diligence to gather additional information that would assist the court in determining if there was a reason to know that the children were Indian children.

## C. Reason to Know

¶ 19 Father contends that the juvenile court erred by concluding that there was no reason to know the children were Indian children because the ICWA information provided "consisted of specific representations" of the children's tribal heritage as opposed to "mere assertions." We are not persuaded.

¶ 20 Assertions that a member of the child's family may have Indian heritage through a particular tribe or a tribal ancestry group is not sufficient to give the juvenile court a reason to know that the child is an Indian child. *H.J.B.*, ¶ 4. As our supreme court reasoned, section 19-1-126(1)(a)(II)(B) "doesn't refer to information indicating that the child *may be* an Indian child. It refers to information indicating that the child *is* an Indian child." *E.A.M.*, ¶ 46. And simply reporting that the child may have Indian heritage because some of their relatives believe they have Indian ancestors is insufficient to indicate to the court that the child is either (1) a member of an Indian tribe or (2) both eligible to be a member and the biological child of a member of an Indian tribe. *Id.* at ¶ 47; *see* 25 U.S.C. § 1903(4); § 19-1-103(83)

10

¶ 21    Here, the juvenile court had information that some of the children's ancestors may have had Indian heritage.  This information did not indicate that either child satisfied the statutory definition of an Indian child.  *See* 25 U.S.C. § 1903(4); § 19-1-103(83).  On the contrary, the juvenile court had information that mother was not registered with the Lakota Sioux tribe, father was not a member of any tribe, and the children were not members of any tribe.[5]  Based on the information it received, the juvenile court did not have reason to know that the children were Indian children.  Thus, the juvenile court properly directed the Department to exercise due diligence under section 19-1-126(3).

## D.    Due Diligence

¶ 22    The juvenile court's conclusion that the Department exercised due diligence is supported by the record, which reflects that the Department communicated with the parents, paternal

---

[5] True, as father asserts, tribal membership and eligibility are matters within the exclusive control of each Indian tribe.  *People in Interest of K.C. v. K.C.*, 2021 CO 33, ¶ 28.  But in concluding it did not have reason to know the children were Indian children, the juvenile court did not substitute its own determination regarding membership for that of the tribes.  The juvenile court simply relied on the information provided regarding the parents' actual statuses.

grandmother, and maternal aunt, and sent informal inquiries to fourteen tribes and organizations. Even so, father asserts that the Department failed to comply with the due diligence requirement because it did not (1) follow up with the tribes and organizations that did not respond to the informal inquiries; (2) follow up with the eight tribes identified in the Citizen Potawatomi Nation's response letter; and (3) identify, investigate, and contact any of mother's relatives that maternal aunt indicated were enrolled in the Lakota Sioux Tribe. We disagree.

¶ 23 First, father does not direct us to any authority requiring a department to follow up when a tribe or organization does not respond to its inquiries.[6] *See H.J.B.*, ¶¶ 51, 58 (noting that due

_____

[6] While not controlling here, the General Assembly's recent enactment of the Colorado Indian Child Welfare Act provides useful guidance regarding what actions it deems sufficient to fulfill the due diligence obligation. *See* §§ 19-1.2-101, -102, C.R.S. 2025 (providing the title and legislative declaration for the Colorado Indian Child Welfare Act); § 19-1.2-107(4)(b), C.R.S. 2025 (listing six tasks the petitioning party shall undertake when exercising due diligence). While the statute requires the petitioning party to contact tribal representatives by email, phone call, letter, or other agreed upon means, it does not include any follow-up requirements. § 19-1.2-107(4)(b)(VI).

diligence does not require a department to provide notice to tribes or to "exhaust every possible option").

¶ 24    Second, "ICWA applies only if the Tribe is a federally recognized Indian Tribe." *People in Interest of L.L.*, 2017 COA 38, ¶ 36, *overruled on other grounds by*, *E.A.M.*, ¶ 56 n.10. The record indicates that the Department sent informal inquiries to all seven federally recognized Potawatomi tribes. Nothing in the record suggests that the response letter sent by the Citizen Potawatomi Nation listed additional federally recognized tribes to whom no informal inquiry was sent. And father does not identify any federally recognized Potawatomi tribe not included in the Department's informal inquiries.

¶ 25    Finally, while maternal aunt informed the caseworker that maternal great-grandmother, some of her children, and some of her cousins were enrolled in the Lakota Sioux tribe, she also indicated that she did not have contact information for other family members, and that great-grandmother was deceased. The caseworker followed up with maternal aunt three more times, and maternal aunt did not have any additional information. The record also reflects that mother's mother was deceased. It appears from the

record that the Department exhausted all efforts to identify and investigate relatives that may have had information regarding mother's heritage. And father does not identify any specific efforts that the Department failed to pursue that could have provided this information.

¶ 26 We conclude that the juvenile court did not abuse its discretion when it determined that the Department exercised the due diligence required by section 19-1-126(3). On this record, we perceive no error in the juvenile court's conclusions that the children were not Indian children and that ICWA did not apply.

### III. Virtual Testimony

¶ 27 Father contends that the juvenile court abused its discretion when it allowed the Department to present the testimony of the children's therapists virtually. We discern no error.

### A. Applicable Law and Standard of Review

¶ 28 Under C.R.C.P. 43(i)(1), a "party may request that testimony be presented at a trial or hearing by a person absent from the courtroom by means of telephone or some other suitable and equivalent medium of communication." The motion for absentee testimony must include the reasons for allowing such testimony,

14

"[a] detailed description of all testimony which is proposed to be taken" virtually, and copies of all documents or reports that will be used during such testimony. *Id.*

¶ 29    The court "shall determine whether in the interest of justice absentee testimony may be allowed." C.R.C.P. 43(i)(3). In doing so, the court must consider the following nonexclusive factors: (1) whether there is a statutory right to absentee testimony; (2) the cost savings to the parties of having absentee testimony versus the cost of the witness appearing in person; (3) the availability of appropriate equipment at the court to permit the presentation of absentee testimony; (4) the availability of the witness to appear in person; (5) the relative importance of the issue for which the witness is offered to testify; (6) if credibility of the witness is an issue; (7) whether the case is to be tried to the court or to a jury; (8) whether the presentation of absentee testimony would inhibit the ability to cross-examine the witness; and (9) the efforts of the requesting parties to obtain the presence of the witness. *Id.*

¶ 30    We review de novo a trial court's interpretation and application of a rule of civil procedure. *Garcia v. Schneider Energy Servs., Inc.*, 2012 CO 62, ¶ 7. But we review the juvenile court's decisions

regarding the orderly administration of a trial, including a decision to allow absentee testimony under C.R.C.P. 43(i), for an abuse of discretion. *See People in Interest of M.W.*, 2022 COA 72, ¶ 12. The juvenile court abuses its discretion when its decision is based on an erroneous understanding or application of law, or if it is manifestly arbitrary, unreasonable, or unfair. *Id.*

## B. Analysis

¶ 31 Over father's objection, the juvenile court granted the Department's motion requesting that the children's therapists be allowed to testify virtually at the termination hearing. Father asked the juvenile court to reconsider, arguing that the Department's motion was insufficient under C.R.C.P. 43. At the start of the termination hearing, the juvenile court allowed counsel to make an additional record. Father's counsel argued that the court failed to make specific findings under C.R.C.P. 43, that father had the right to confront the witnesses against him, and that father would have a difficult time seeing the witnesses on a screen across the courtroom.

¶ 32 The juvenile court concluded that there was no prejudice to the parents, that the cases the parents cited related to the criminal

right of confrontation, that the request for virtual testimony was allowable pursuant to the rules of civil procedure, that the witnesses were unable to appear in person that day, and that another continuance to allow them to appear in person was not in the children's best interests given that they had been in out-of-home placement for 728 days. To alleviate the parents' concerns about seeing the witnesses, however, the court allowed them to use its laptop to ensure they could see the witnesses during their testimony.

¶ 33 Father asserts that the juvenile court erred by allowing the therapists to testify virtually for three reasons. First, father contends that the Department's sole basis for requesting virtual testimony for the therapists — that scheduling conflicts made it difficult for the witnesses to appear in person — was insufficient. Essentially, father argues that the witness must have been unable to appear in person or unable to be subpoenaed before the court could authorize absentee testimony.

¶ 34 But under C.R.C.P. 43(i)(3), "[t]he availability of the witness to appear personally in court" is but one factor for the court to consider. Had our supreme court intended to authorize a court to

permit absentee testimony only when a witness was unavailable to testify in person, it would have said so. *See People v. McLaughlin*, 2023 CO 38, ¶ 27 ("[W]e do not add words to or subtract words from rules."); *cf. People v. Laeke*, 2018 COA 78, ¶ 16 (If the supreme court intended a rule of criminal procedure to cover a particular type of plea, "it certainly knew how to say so." (citation omitted)); *see also* Colo. Const. art. VI, § 21 (granting the supreme court authority to promulgate rules governing practice and procedure in civil cases); *Williams v. Crop Prod. Servs., Inc.*, 2015 COA 64, ¶ 17 ("The Colorado Rules of Civil Procedure are promulgated by the Colorado Supreme Court, with input from the court's Civil Rules Committee.").

¶ 35 Second, father contends that the Department failed to provide a "detailed description of all testimony which is proposed to be taken" as required by C.R.C.P. 43(i)(1)(B). True, the Department's motion did not contain a description of the proposed testimony for each witness. But it did incorporate by reference the Department's previously filed witness list, which included a summary of the witnesses' possible testimony. Still, father argues that disclosure was not sufficiently detailed to satisfy the rule.

¶ 36 Even assuming, without deciding, that the Department's disclosure lacked sufficient detail under C.R.C.P. 43(i)(1)(B), father fails to articulate any prejudice stemming from this lack of disclosure. As discussed further below, father's claims of prejudice focus on the consequential nature of the therapists' testimony. And much of this allegedly prejudicial testimony — including testimony regarding the children's behaviors after contact with the parents and the children's preferences for adoption — was cumulative of other evidence presented by the Department.

¶ 37 Third, father contends that the juvenile court erred because it failed to make an "interest of justice determination" and to fully consider the nine factors in C.R.C.P. 43(i)(3). To be sure, the court did not use the words "interest of justice" when granting the Department's motion, but its findings make clear it made that determination. Indeed, the court focused on the length of time the children had been in out-of-home placement — 728 days — and determined that continuing the hearing to allow the witnesses to appear in person was not in the children's best interests under the circumstances.

¶ 38    We acknowledge that the juvenile court also did not make findings as to all nine of the factors listed in C.R.C.P. 43(i)(3).  But nothing in the rule or any case law of which we are aware requires the court to make explicit findings as to every factor.  *See People in Interest of A.M.K.*, 68 P.3d 563, 566 (Colo. App. 2003) (When a statute directs the court to "consider" a list of factors, it "need not make specific findings on each and every factor . . . so long as there is some indication in the record that the pertinent factors were considered.").  So long as it considers the relevant factors, the court has broad discretion to determine whether absentee testimony should be allowed based on those factors or others.  *See* C.R.C.P. 43(i); *M.W.*, ¶ 17 (noting that "trial courts are better positioned than appellate courts to make the discretionary determination whether to permit remote testimony").

¶ 39    Notably, father's only claim of prejudice resulting from the witnesses' video appearances is that "audio problems" occurred during his counsel's cross-examination of one of the children's therapists.  We acknowledge that, at one point during the cross-examination of this therapist, the court said "the audio is coming in and out a little bit" and had the witness repeat her

answer. But there is no evidence that this minor audio issue impeded father's counsel's ability to fully cross-examine the witness or otherwise impacted the basic fairness of the trial itself. *See* C.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); *Bernache v. Brown*, 2020 COA 106, ¶ 26 ("An error affects the substantial rights of the parties if it 'substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" (quoting *Laura A Newman, LLC v. Roberts*, 2016 CO 9, ¶ 24)). Although father also claims he was prejudiced because the therapists "provided consequential testimony that was material to the court terminating [f]ather's parental rights," that prejudice stems not from the juvenile court's decision to allow the therapists to testify virtually but from the probative force of the substantive evidence.

¶ 40 Thus, we conclude that the juvenile court did not abuse its discretion by allowing the witnesses to testify virtually.

## IV. Fitness Within a Reasonable Time

¶ 41 Mother contends that the juvenile court erred by finding that she could not become fit within a reasonable time. We disagree.

21

### A. Applicable Law and Standard of Review

¶ 42 A parent must have a reasonable amount of time to work on a treatment plan before the juvenile court terminates their parental rights. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). What constitutes a reasonable time to comply with a treatment plan is necessarily fact specific and may vary from case to case. *Id.* But a reasonable time is not an indefinite time; it must be determined by considering the children's physical, mental, and emotional conditions and needs. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25. In determining whether a parent's conduct or condition is likely to change and whether the parent can become fit within a reasonable time, the juvenile court may consider, among other things, whether any change occurred during the dependency or neglect proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006).

¶ 43 Whether a juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. We review the court's factual findings for clear error but review de novo its legal conclusions based on those facts.

*Id.* The credibility of witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn from the evidence are within the discretion of the juvenile court. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

### B. Analysis

¶ 44 The juvenile court found that mother's conduct or condition was unlikely to change within a reasonable time, noting that mother had not demonstrated significant cooperation for the duration of the two-year-long case. The record supports these findings.

¶ 45 The caseworker testified that mother first began participating in the case approximately twenty months after it began. And during the two years the case was pending, mother did not have stable housing, report any job or income source, seek treatment for her mental health issues, or attend family time with the children. The caseworker opined that it was unlikely, even with more time, that mother would become fit.

¶ 46 Mother asserts that, considering her "substantial progress" over the last four months of the case, she was "on track to being a fit parent within months." True, approximately four months before

the termination hearing, mother entered a residential treatment program for substance abuse and remained sober during that time. But, as the caseworker testified, mother had not demonstrated an ability to maintain sobriety outside of residential treatment. And to be considered fit, mother would need to demonstrate sobriety, safety, and stability once she returned to the community.

¶ 47 In concluding that mother was unlikely to become fit within a reasonable time, the juvenile court specifically considered the evidence of her recent progress, acknowledging that she had "taken responsibility and maintained sobriety for 127 days." But the court found that the children had been waiting 728 days for permanency and that it was unknown if mother would be able to maintain sobriety outside of residential treatment. Focusing on the children's needs, the court found that mother's conduct or condition was unlikely to change within a reasonable time. Mother effectively asks us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do. *S.Z.S.*, ¶ 29.

## V.    Less Drastic Alternatives

¶ 48    Both parents contend that the juvenile court erred by finding that termination was in the children's best interests because an allocation of parental responsibilities (APR) to paternal grandmother was a viable less drastic alternative.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 49    Consideration and elimination of less drastic alternatives is implicit in the statutory scheme for termination.  *A.M.*, ¶ 40.  In considering less drastic alternatives, a court must give primary consideration to the children's physical, mental, and emotional conditions and needs.  § 19-3-604(3), C.R.S. 2025; *People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004).  A court may also consider, among other things, (1) whether an ongoing relationship with a parent would be beneficial to the children, which is influenced by a parent's ability to care for the children's needs, *People in Interest of A.R.*, 2012 COA 195M, ¶ 38; (2) whether the children are bonded with the parent, *People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009); and (3) whether an APR provides adequate permanence and stability for the children, *People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005).

¶ 50    For a less drastic alternative to be viable, it must do more than "adequately" meet the children's needs; rather, it must be in the children's best interests. *A.M.*, ¶ 27. Consequently, if the juvenile court considers a less drastic alternative but finds instead that termination is in the children's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32.

¶ 51    "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34, *aff'd sub nom.*, *R.W. v. People in Interest of E.W.*, 2022 CO 51. When a juvenile court considers less drastic alternatives but nonetheless finds that termination is in the children's best interests, we are bound to affirm the decision so long as the record supports the court's finding. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B.    Analysis

¶ 52    The juvenile court considered whether an APR to paternal grandmother was in the children's best interests but ultimately concluded it was not. Specifically, the court found that paternal grandmother and the children all preferred adoption. The court also found that the children experienced trauma with their parents, demonstrated behavioral issues after contact with their parents,

26

and deserved stability and structure that neither parent had demonstrated. Ultimately, the court found that it was in the children's best interests to have the permanency that only adoption could provide.

¶ 53   The record supports these findings. The caseworker testified that paternal grandmother did not agree to an APR and that both children expressed excitement about adoption. The children's therapists also testified that they had expressed interest in being adopted. The caseworker testified that mother did not visit the children during the two years the case was open and had only occasional phone contact with them. The caseworker also testified that, after contact with the parents, both children demonstrated behavioral issues — T.D-J.G-R. would shut down and not talk, and A.L-L.G-R. would have meltdowns.

¶ 54   The children's therapists similarly described the children's regressions following contact with their parents. T.D-J.G-R.'s therapist described that, following contact, he became very dysregulated, angry, and irritable. And A.L-L.G-R.'s therapist described that, following contact, she would exhibit "crisis behaviors," including property destruction, yelling, screaming,

crying, and losing the ability to communicate and calm down. Both therapists expressed that the children needed routine and structure.

¶ 55 Ultimately, the caseworker opined that (1) the children would feel more comfortable and less triggered if they knew there was no uncertainty about what could happen next; (2) continuing the parent-child relationships would not be beneficial to the children; and (3) adoption would be best for the children's physical, mental, and emotional needs.

¶ 56 We reject the parents' arguments that, because paternal grandmother's opposition to an APR may have been based on inaccurate information from the caseworker, the juvenile court erred by eliminating an APR as a less drastic alternative. To the extent the caseworker described an APR to paternal grandmother as requiring consultation with the parents within twenty-four to forty-eight hours of a decision or emergency regarding the children, that description was incorrect. But the evidence reflects that paternal grandmother also gave other reasons why she did not agree with an APR, including a desire for permanency for the children. *See People in Interest of P.D.*, 580 P.2d 836, 838 (Colo.

App. 1978) (noting that a court cannot allocate parental responsibilities to an unwilling party who is not the child's parent). And regardless of paternal grandmother's willingness to accept an APR, the court found, with record support, that an APR was not the best option for the children. *See A.M.*, ¶ 32.

¶ 57 We are not persuaded by mother's argument that an APR would provide the children with sufficient stability because mother would need to demonstrate that any future modification would be in the children's best interests. The court clearly considered an APR as an alternative to termination and found that it was "in the best interest of the children to have permanency that only an adoption [could] provide." As noted, the court's finding enjoys record support. "And it is not our role to reweigh the evidence or substitute our judgment for that of the juvenile court." *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

¶ 58 Because the record supports the juvenile court's finding that there was no less drastic alternative to termination, we cannot disturb it. *See B.H.*, ¶ 80.

## VI. Ineffective Assistance of Counsel

¶ 59    Finally, both parents contend that they received ineffective assistance of counsel. We are not persuaded.

### A. Applicable Law

¶ 60    A parent has a statutory right to effective assistance of counsel in dependency or neglect proceedings. §§ 19-1-105(2), 19-3-202(1), C.R.S. 2025; *A.R. v. D.R.*, 2020 CO 10, ¶ 47. To establish a claim of ineffective assistance of counsel, a parent must show that (1) counsel's performance was deficient because it fell outside the wide range of professionally competent assistance; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *A.R. v. D.R.*, ¶¶ 48-51, 60; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984) (establishing the elements of an ineffective assistance of counsel claim in a criminal proceeding). "If the parent fails to establish either prong of this test, the claim fails." *People in Interest of C.B.*, 2019 COA 168, ¶ 26. Under certain narrow circumstances, such as when counsel is acting under a conflict of interest, prejudice may be presumed. *A.R. v. D.R.*, ¶ 66.

¶ 61 We must remand for an evidentiary hearing if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel. *Id.* at ¶ 63. But if the parent's allegations lack specificity, we may summarily deny the ineffective assistance claim. *Id.* We "will generally be able to resolve an ineffective assistance of counsel claim involving . . . presumed prejudice without a remand." *Id.* at ¶ 66.

## B. Father's Claims

¶ 62 Father contends that he received ineffective assistance from (1) former counsel, who labored under a conflict of interest when she was later appointed as mother's guardian ad litem (GAL); (2) trial counsel, when she did not object to former counsel's appointment as mother's GAL; and (3) trial counsel, when she failed to object to inadmissible hearsay testimony. We disagree.

### 1. Conflict of Interest

¶ 63 At the initial shelter hearing, the juvenile court appointed counsel for father (former counsel) who indicated that she had spoken to father, and he likely would not be able to appear. She then objected to the Department's request that father submit to a hair follicle test. Former counsel appeared at the next hearing two

31

weeks later, informed the court that she had been unable to speak to father since the prior hearing, and asked to be dismissed from the case. The court granted her request.

¶ 64 Twenty-one months later, mother's counsel requested, and the juvenile court appointed, a GAL for mother. But when that GAL was unavailable for the scheduled termination hearing, the juvenile court appointed former counsel as mother's GAL. No one objected, and former counsel served as mother's GAL through the conclusion of the termination hearing.

¶ 65 Although we need not go so far as to conclude that former counsel had a conflict of interest or violated any rule of professional conduct,[7] we share the parents' concerns that former counsel's dual roles were seemingly overlooked by counsel and the juvenile court. Still, we need not determine whether former counsel performed deficiently by laboring under the alleged conflict or if trial counsel performed deficiently by not objecting, because father has not alleged any adverse effect from former counsel's representation.

---

[7] For example, father's arguments assume that his and mother's interests in the action were "materially adverse," *see* Colo. RPC 1.9(a), a conclusion we need not reach to resolve father's appeal.

¶ 66    Instead, father asks us to simply presume prejudice.  But before we can presume prejudice, father must first establish that (1) former counsel labored under a conflict of the kind contemplated by *Cuyler v. Sullivan,* 446 U.S. 335, 349-50 (1980); and (2) the conflict "adversely affected" counsel's representation.  *Ybanez v. People,* 2018 CO 16, ¶ 27.  To prove an "adverse effect," father must

> (1) identify a plausible alternative . . . strategy
> or tactic that counsel could have pursued,
> (2) show that the alternative strategy or tactic
> was objectively reasonable under the facts
> known to counsel at the time of the strategic
> decision, and (3) establish that counsel's
> failure to pursue that strategy or tactic was
> linked to the conflict.

*Id.*

¶ 67    Setting aside the fact that former counsel did not represent father while serving as mother's GAL and thus did not labor "under a conflict of a kind to which the *Sullivan* prophylaxis applies," *id.,*[8]

---

[8] In *Cuyler v. Sullivan,* 446 U.S. 335, 337-38 (1980), counsel simultaneously represented three defendants.  The Court explained that, because multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest, a defendant who does not object to the multiple representation at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance to establish a violation of the Sixth Amendment.  *Id.* at 348.

father does not assert any adverse effect that the alleged conflict had on former counsel's representation. And we do not discern any adverse effect from the record. In fact, other than providing support and reassurance to mother during the hearing, it appears former counsel's only other role was to negotiate a deal whereby mother and father made statements to the juvenile court without being subject to cross-examination from the Department or the children's GAL, which ultimately benefited father.

¶ 68 Seemingly recognizing that the alleged conflict did not adversely affect former counsel's representation, father asserts that we should not engage in the "adverse effects" inquiry in dependency or neglect cases because of the fundamental liberty interest involved and the difficulties in conducting such an inquiry in civil termination proceedings "that involve complex and multifaceted issues with multiple parties and interests." But our supreme court has made clear that "the same standard for presumed prejudice [in the criminal context] should apply in the termination of parental rights context." *A.R. v. D.R.*, ¶ 66.

¶ 69 Absent a showing that the alleged conflict of interest adversely affected former counsel's representation of father, we will not

presume that father was prejudiced. As a result, father's claim of ineffective assistance related to former counsel fails. *See C.B.,* ¶ 26 (if a parent fails to establish either prong of the test, the claim fails). And because father has not shown any prejudice resulting from the alleged conflict, his claim that trial counsel was ineffective for failing to object to it likewise fails. *See id.*

### 2. Hearsay

¶ 70 Father next asserts that he received ineffective assistance from trial counsel when she failed to object to hearsay testimony from the caseworker and the children's therapists regarding the children's and paternal grandmother's preferences for adoption over an APR. We need not decide whether counsel's failure to object amounted to deficient performance, because even if it did, father has failed to show that, but for this failure to object, the result of the proceeding would have been different. *See A.R. v. D.R.,* ¶ 60.

¶ 71 Father asserts that the juvenile court "heavily relied" on the inadmissible hearsay when finding that there were no less drastic alternatives to termination such that, but for counsel's failure to object, there is a reasonable probability that the juvenile court would have "found the less drastic alternative of an APR to

[p]aternal [g]randmother." But, as discussed above, separate and apart from acknowledging the stated preferences, the juvenile court found that the children needed permanency that only adoption could provide. On this record, we conclude that there is no reasonable probability that the result of the proceeding would have been different had trial counsel objected to the hearsay statements. *See id.*

## C.    Mother's Claim

¶ 72    Mother contends that she received ineffective assistance because her counsel failed to timely disclose a retained expert witness, resulting in the juvenile court's disallowance of the expert's testimony. Mother argues that her expert's testimony would have described the adverse impact that a termination of parental rights can have on children and swayed the court to find that the less drastic alternative of an APR to paternal grandmother was in the children's best interests. We are not persuaded for two reasons.

¶ 73    First, regardless of when the disclosure was made, the record reflects that the expert witness was unavailable to testify at the hearing. In other words, mother cannot establish a reasonable probability that the outcome of the hearing would have been

different had the disclosures been made on time because the witness was still not available to testify.

¶ 74 Second, contrary to mother's claim that the late disclosure resulted in the "complete exclusion" of her expert witness' testimony, the juvenile court accepted a summary of the witness' testimony as an offer of proof. After considering the offer of proof, the juvenile court determined that the expert's testimony "would not provide any additional persuasive information or helpful information that would change the [c]ourt's outcome in this matter." Because the record demonstrates that, even if the disclosure was timely and the witness was allowed to testify, the outcome of the proceeding would not have been different, mother's ineffective assistance of counsel claim fails. *See C.B.,* ¶ 26.

VII. Disposition

¶ 75 The judgment is affirmed.

JUDGE FOX and JUDGE MEIRINK concur.